UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 07-294 |
| Plaintiff, | |
| v. | VIOLATION: 18 U.S.C. § 371 |
| INGERSOLL-RAND ITALIANA SpA, | OCT 31 2007 |
| Defendant. | |

LEON, J. RJL

**INFORMATION**

The United States Department of Justice, Criminal Division, Fraud Section, charges as follows:

1. At all times material to this Information (unless specified otherwise):

GENERAL ALLEGATIONS

*Relevant Entities and Individuals*

2. INGERSOLL-RAND ITALIANA SpA ("IR Italiana"), as of January 1, 2002 a wholly-owned subsidiary of Ingersoll-Rand Company Limited and prior to that date a wholly-owned subsidiary of Ingersoll-Rand Company (collectively "Ingersoll") incorporated in Italy, was a global manufacturer and supplier of air compressors used in oil refineries. IR Italiana was headquartered in Vignate, Italy, maintained operations in a number of foreign countries, and managed its sales in the Middle East region from an office in Cairo, Egypt.

3. Ingersoll, IR Italiana's parent company, is a Bermuda company with executive offices in New Jersey. Prior to January 1, 2002, it was a New Jersey company with executive offices in New Jersey. It issued and maintained a class of publicly-traded securities registered

Case Related To: CR 07-253 (RJL)

pursuant to Section 12(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78l), which traded on the New York Stock Exchange. As such, it was required to file periodic reports with the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act (15 U.S.C. § 78m). Accordingly, Ingersoll was an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78dd-1(a). By virtue of its status as an issuer, Ingersoll was required to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and disposition of assets of Ingersoll and its subsidiaries, including those of IR Italiana, which were incorporated into the books of Ingersoll.

4.   "Employee A," an Italian citizen, was an IR Italiana sales manager for the Middle East based in Cairo, Egypt.

5.   "Employee B," a Swiss citizen, was IR Italiana's regional manager for the Middle East based in Cairo, Egypt.

6.   "Company X," based in Jordan, served as both an agent and distributor for IR Italiana in the Middle East and was the primary intermediary between IR Italiana and the government of Iraq.

*Overview of the Kickback Scheme*

7.   Between in or around November 2000 and in or around May 2002, IR Italiana was awarded four contracts valued at approximately €5,262,990 with the Government of the Republic of Iraq for the sale of air compressors under the United Nations Oil-for-Food Program ("OFFP"). IR Italiana secured these contracts through the payment of approximately €513,861 in kickbacks to the government of Iraq. During this time period, IR Italiana also paid

approximately $20,282 for travel, entertainment, and "pocket money" for eight Iraqi government officials.

8. The kickbacks were authorized by Employee A and were paid to the government of Iraq through Company X. Company X also facilitated the travel of the eight Iraqi officials. IR Italiana concealed the kickbacks from the United Nations ("U.N.") by inflating its contract prices by 10% before submitting the contracts for approval to the U.N. IR Italiana disguised the kickbacks and the payments to the Iraqi officials on its corporate books and records by terming them "sales deductions" and "other commissions." In doing so, IR Italiana falsified its own books, causing Ingersoll's books to be false as well.

*The United Nations Oil-for-Food Program*

9. On or around August 6, 1990, days after Iraq's invasion of Kuwait, the U.N. adopted Security Council Resolution 661, which prohibited U.N. member states from transacting business with Iraq, except for the purchase and sale of humanitarian supplies. Resolution 661 prohibited virtually all direct financial transactions with the government of Iraq.

10. On or around April 15, 1995, the U.N. adopted Security Council Resolution 986, which provided a limited exception to the Iraq sanctions regime in that it allowed Iraq to sell its oil. However, Resolution 986 required that the proceeds of oil sales be used by the Iraqi government to purchase humanitarian supplies for the Iraqi people, including food and equipment to maintain and service Iraq's oil sector. Hence, this program became known as the Oil for Food Program. Payments made to the Iraqi government which were not approved by the U.N. and which were outside the strict contours of the OFFP were prohibited.

11. The rules of the OFFP required that the proceeds from all sales of Iraqi oil be deposited into a U.N.-controlled escrow account at the New York branch of Banque Nationale de Paris ("BNP-Paribas"). That escrow account funded the purchase of humanitarian goods by the Iraqi government.

12. Under the provisions of the OFFP, a supplier of humanitarian goods contracted with a ministry or other department of the Iraqi government to sell goods to the Iraqi government. Once that contract was finalized, the contract was submitted to a U.N. Committee ("the 661 Committee") which reviewed the contracts to ensure that their terms complied with all OFFP and Iraqi sanction regulations. The 661 Committee accepted the contracts, rejected them, or asked the supplier to provide additional information upon which the committee could make a decision.

13. If a contract was approved by the 661 Committee, a letter of credit was issued by the New York branch of BNP-Paribas to the supplier's bank stating that the supplier would be paid by the OFFP for the relevant goods once certain conditions were met, including delivery of the goods to Iraq and inspection of the goods by a U.N. contractor. Once those conditions were deemed by the U.N. to have been met, the U.N. would direct BNP-Paribas to release payment to the supplier.

14. On or around December 10, 1996, the first Iraqi oil exports under the OFFP began. The OFFP continued from in or around December 1996 until the United States invasion of Iraq on or around March 19, 2003. From in or around December 1996 through March 2003, the United States government prohibited United States companies and individuals from engaging in

transactions with the government of Iraq, unless such transactions were authorized by the U.N. pursuant to the OFFP. 31 C.F.R. § 575.201, *et seq.*

15.   Beginning in approximately August 2000, the Iraqi government demanded that suppliers of humanitarian goods pay a kickback, usually valued at 10% of the contract price, to the Iraqi government in order to be awarded a contract by the government. These kickbacks violated U.N. OFFP regulations and U.N. sanctions which prohibited payments to the Iraqi government which were not expressly approved by the U.N. and which were not contemplated by OFFP guidelines.

16.   Often, these kickbacks were termed "after sales service fees" ("ASSFs"). They did not, however, involve the performance of any actual service by the supplier. Typically, these ASSFs were included in the contract price submitted by the supplier to the U.N. without disclosing to the U.N. the fact that the contract contained an extra 10% which would be kicked back to the Iraqi government. Including the 10% in the submitted contract price allowed the supplier to avoid paying the 10% out of its profits; instead, the suppliers caused the U.N., unknowingly, to fund the kickbacks to the Iraqi government.

17.   In many cases, during or after contract negotiations, the Iraqi government asked the supplier to sign an auxiliary contract, usually called a "side letter," memorializing the supplier's commitment to pay the ASSFs. These side letters usually stated explicitly that the supplier agreed to pay a set amount, approximately 10% of the contract price, to the Iraqi government in advance of the arrival of the goods in Iraq.

18.   Some suppliers described the ASSFs as such in the contracts submitted to the U.N. for approval, thereby leading the U.N. to believe that actual after-sales services were being

provided by the supplier. Other suppliers disguised the ASSFs by inserting fictitious line items into the contracts for goods or services that were not being provided. Still other suppliers simply inflated their contract prices by 10% to account for the payments they would make, or cause to be made, to the Iraqi government.

## COUNT ONE
### (Conspiracy)

### THE CONSPIRACY AND ITS OBJECT

19. Paragraphs 1 through 18 of this Information are realleged and incorporated by reference as if set out in full.

20. From in or around November 2000 through in or around May 2002, within the territory of the United States and elsewhere, IR Italiana and others, known and unknown, did unlawfully and knowingly combine, conspire, confederate, and agree to commit the following offenses against the United States:

    a. to knowingly devise, and intend to devise a scheme and artifice to defraud the United Nations and the Oil-for-Food Program, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, through the use of interstate and foreign wire communications, in violation of Title 18, United States Code, Section 1343; and

    b. to knowingly falsify and cause to be falsified books, records, and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Ingersoll, an issuer within the meaning of the FCPA, in violation of Title 15, United States Code, Section 78m(b)(2)(A), 78m(b)(5) and 78ff(a).

## PURPOSE OF THE CONSPIRACY

21.     The primary purpose of the conspiracy was to obtain and retain lucrative business with the government of Iraq through the payment of kickbacks to the Iraqi government, which were concealed or disguised as legitimate charges.

## MANNER AND MEANS OF THE CONSPIRACY

22.     To achieve the goal of the conspiracy, IR Italiana and others used the following manner and means, among others:

    a.     It was part of the conspiracy that IR Italiana caused money to be sent to bank accounts controlled by the government of Iraq in exchange for being awarded contracts with that government.

    b.     It was a further part of the conspiracy that IR Italiana submitted contracts to the U.N. which failed to disclose and concealed the fact that the prices of the contracts had been inflated by 10% in order to generate the money that was used to pay kickbacks to the government of Iraq.

    c.     It was a further part of the conspiracy that IR Italiana caused the transmission of international wire communications to give notice to the U.N. that goods had been shipped to, and inspected in, Iraq and to give notice to IR Italiana's banks in the United Kingdom and Italy that the U.N. was authorizing payments pursuant to the contracts.

    d.     It was a further part of the conspiracy that IR Italiana falsely described the kickbacks paid to the Iraqi government in its corporate books and records, mischaracterizing the payments as "sales deductions" and "other commissions," which false descriptions were then incorporated in the corporate books and records of Ingersoll.

## OVERT ACTS

23. In furtherance of the conspiracy and to accomplish its unlawful object, the following overt acts, among others, were committed within the territory of the United States and elsewhere:

### *IR Italiana-SOMO Contracts*

24. In or around November 2000, Employee A negotiated three contracts with the Iraqi State Oil Marketing Organization ("SOMO") for the sale of oil refinery air compressors and spare parts and agreed to pay a 10% kickback on each contract.

### First Contract – Contract 830139

25. On or around November 11, 2000, to conceal, and to generate money to fund, the kickback for the anticipated first contract, subsequently referenced by the U.N. as Contract 830139, Employee A and SOMO created a fictitious line item in IR Italiana's purchase order purporting to call for IR Italiana to provide goods and services that the parties did not intend IR Italiana to provide. Specifically, a Contract 830139 purchase order falsely stated that IR Italiana would be paid €58,000 for "packing, handling, and administrative costs."

26. On or around November 20, 2000, IR Italiana was awarded Contract 830139, to supply spare parts to SOMO, with a total contract price of €638,000, which included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in IR Italiana's books and records and was intended to be used to pay a kickback to the Iraqi government through Company X.

27. On or around December 5, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a notice to the Central Bank of Iraq in Baghdad,

Iraq, notifying it of the issuance of a letter of credit to Strada Provinciale Cassanese in Milan, Italy, authorizing the eventual payment of €638,000 from the OFFP escrow fund maintained at BNP-Paribas to IR Italiana, which represented payment for Contract 830139.

28. On or around March 26, 2002, a company based in Geneva, Switzerland, that provided commercial inspection services on behalf of the U.N. in Iraq ("the inspection company"), sent from Iraq to the U.N. in New York, via international wire communication, notification that IR Italiana products purchased pursuant to Contract 830139 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to IR Italiana for Contract 830139.

29. On or around April 18, 2002, Company X sent IR Italiana a fictitious invoice for the €58,000 kickback on Contract 830139, falsely itemizing the work performed as "follow up on U.N. administrative work, supervision of the unloading of equipment of Aqaba port, supervision of re-loading of equipment on trucks to final destination, supervision of shipment at the crossing point Jordan/Iraq (trebiel) [sic], supervision of unloading and handing over of equipment at final destination, supervision of installation, commissioning and training of local technicians."

30. In or around May 2002, Company X paid the kickback on Contract 830139 to a bank account controlled by the Iraqi government.

31. On or around July 15, 2002, IR Italiana reimbursed Company X for the kickback on Contract 830139.

### Second Contract – Contract 830173

32. On or around November 13, 2000, to conceal, and to generate money to fund, the kickback for the anticipated second contract, subsequently referenced by the U.N. as Contract 830173, Employee A and SOMO created a fictitious line item in IR Italiana's purchase order purporting to call for IR Italiana to provide goods and services that the parties did not intend IR Italiana to provide. Specifically, a Contract 830173 purchase order falsely stated that IR Italiana would be paid €71,460 for "handling, verification, and inspection."

33. In or around early 2001, Employee A signed a side letter promising to pay a kickback of €71,460 to the Iraqi government in exchange for being awarded Contract 830173.

34. On or around February 12, 2001, IR Italiana was awarded Contract 830173, for the provision of air compressors and spare parts to SOMO, with a total contract price of €666,951, which included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in IR Italiana's books and records and was intended to be used to pay a kickback to the Iraqi government through Company X.

35. On or around May 3, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to Chase Manhattan Bank in Milan, Italy, authorizing the eventual payment of €666,951.00 from the OFFP escrow fund maintained at BNP-Paribas to IR Italiana, which represented payment for Contract 830173.

36. On or around October 28, 2001, the inspection company sent from Iraq to the U.N. in New York, via international wire communication, notification that IR Italiana products purchased pursuant to Contract 830173 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to IR Italiana for Contract 830173.

37. On or around February 20, 2002, Company X sent IR Italiana a fictitious invoice for the €71,460 kickback on Contract 830173, falsely itemizing the work performed as "follow up on U.N. administrative work, supervision of the unloading of equipment of Aqaba port, supervision of reloading of equipment on trucks to final destination, supervision of shipment at the crossing point Jordan/Iraq (Trebiel), supervision of unloading and handing over of equipment at final destination, supervision of installation, commissioning and training of local technicians."

38. On or around February 28, 2002, IR Italiana paid Company X for this fictitious invoice.

39. On or around July 24, 2002, Company X paid the kickback to a bank account controlled by the Iraqi government.

Third Contract – Contract 930047

40. On or around November 16, 2000, to conceal, and to generate money to fund, the kickback for the anticipated third contract, subsequently referenced by the U.N. as Contract 930047, Employee A and SOMO created a fictitious line item in IR Italiana's purchase order purporting to call for IR Italiana to provide goods and services that the parties did not intend IR Italiana to provide. Specifically, a Contract 930047 purchase order falsely stated that IR Italiana would be paid €205,275 for "piping, installation, and commissioning."

41. On or around November 22, 2000, Employee A signed a side letter promising to pay a kickback of €205,275 to the Iraqi government in exchange for being awarded Contract 930047.

42. On or around May 20, 2001, IR Italiana was awarded Contract 930047, for the provision of spare parts to SOMO, with a total contract price of €1,990,275, which included an

11

extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in IR Italiana's books and records and was intended to be used to pay a kickback to the Iraqi government through Company X.

43. On or around July 31, 2001, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a letter of credit to Chase Manhattan Bank in Milan, Italy, authorizing the eventual payment of €1,990,275 from the OFFP escrow fund maintained at BNP-Paribas to IR Italiana, which represented payment for Contract 930047.

44. On or around May 10, 2002, Company X sent IR Italiana a fictitious invoice for the €205,275 kickback on Contract 930047, falsely itemizing the work performed as "follow up on U.N. administrative work, supervision of the unloading of equipment of Aqaba port, supervision of re-loading of equipment on trucks to final destination, supervision of shipment at the crossing point Jordan/Iraq (trebiel) [sic], supervision of unloading and handing over of equipment at final destination, supervision of installation, commissioning and training of local technicians."

45. On or around May 20, 2002, IR Italiana paid Company X for this fictitious invoice.

46. On or around June 2, 2002, Company X paid the kickback for Contract 930047 to a bank account controlled by the Iraqi government.

47. On or around July 15, 2002, the inspection company sent from Iraq to the U.N. in New York, via international wire communication, notification that IR Italiana products purchased pursuant to Contract 930047 had been received and inspected by the inspection company in Iraq, thereby triggering payment by the U.N. to IR Italiana for Contract 930047.

*Company X– SOMO Contract, Contract 830829*

48.     On or around September 7, 2001, Employee A and others signed a contract for IR Italiana to sell spare parts to Company X for €941,500 so that Company X could offer those parts to SOMO in connection with an upcoming contract tender.

49.     On or around September 30, 2001, Company X submitted a bid on the spare parts tender for €1,967,764, which included a 10% fee to be paid to the Iraqi government.

50.     On or around October 10, 2001, Company X signed a side letter promising to pay a €179,126 kickback to the Iraqi government in exchange for the spare parts contract.

51.     On or around October 14, 2001, Company X was awarded Contract 830829, to supply spare parts to SOMO, with a total contract price of €1,967,764, which included an extra 10% fee. This fee was concealed in contracts and correspondence with the U.N. and in IR Italiana's books and records and was intended to be used to pay a kickback to the Iraqi government through Company X.

52.     On or around April 4, 2002, the New York branch of BNP-Paribas sent, via an international electronic wire communication, a notice to the Central Bank of Iraq in Baghdad, Iraq, notifying it of the issuance of a letter of credit to Jordan National Bank in Amman, Jordan, authorizing the eventual payment of €1,967,764 from the OFFP escrow fund maintained at BNP-Paribas to Company X, which represented payment for Contract 830829.

53.     On or around August 18, 2002 and November 16, 2002, the inspection company sent from Iraq to the U.N. in New York, via international wire communication, notification that IR Italiana products purchased pursuant to Contract 830829 had been received and inspected by

the inspection company in Iraq, thereby triggering payment by the U.N. to Company X for Contract 830829.

*Payments from IR Italiana to Company X*

54. From in or around April 2001 to in or around September 2001, IR Italiana agreed to make payments to Company X that included the 10% kickback payments to the Iraqi government.

55. On or around June 20, 2001, Employee A sent a memorandum to Company X that set forth the payments to be made to Company X, itemized to reflect payments to the company and kickbacks to the Iraqi government on four U.N. OFFP contracts – 830139, 830173, 830829, and 930047.

56. On or around September 7, 2001, Company X, Employee A, and others signed a contract specifying the amount to be paid to Company X to cover the kickbacks paid to the Iraqi government and the commissions owed to Company X for the four contracts. The kickback payments were concealed in the agreement by falsely terming them payments for "follow up on all U.N. administrative work, supervision of the unloading of equipment of Aqeba part [sic,] supervision of reloading of equipment on trucks for final destination Iraq, supervision of shipment at the crossing point at Jordanian and Iraq border including all paper work, cost of any additional insurance, supervision of unloading and handing over of equipment at final destination in Iraq, supervision of installation, commissioning and training of local technicians."

*Trip to Italy by Iraqi Government Officials*

57. In or around February 2002, Company X and Employee B arranged a visit by eight officials of the Iraqi government to Vignate and Milan, Italy, during which some of the officials

spent two days touring IR Italiana's facility and the remainder of the week-long trip sightseeing. In arranging the trip with Employee B, Company X stated that only two of the officials were there for business purposes and the other six were "on holiday."

58.  In or around February 2002, in connection with the trip to Italy, IR Italiana spent $10,484 on hotels, $1,798 on taxis, and gave each of the eight officials $1000 "pocket money," for a total of $20,282.

59.  In or around February 2002, Employee B told IR Italiana employees in Italy that it was important to treat the Iraqi government officials well because it would encourage the officials to give IR Italiana more business.

*Books and Records*

60.  In order to conceal the kickback payments to the Iraqi government on its books and records, IR Italiana improperly characterized the payments as "sales deductions" and "other commissions." The pocket money payments given to the Iraqi officials during their trip to Italy were falsely recorded as "cost of sales deferred."

61.  At the end of Ingersoll's fiscal year, each year from 2000 through 2002, the books and records of IR Italiana, including those containing false characterizations of the payments given to, and trip expenses paid on behalf of, the Iraqi government and its officials were

incorporated into the books of Ingersoll for purposes of preparing Ingersoll's year-end financial statements.

(All in violation of Title 18, United States Code, Section 371.)

STEVEN A. TYRRELL
Chief, Fraud Section

MARK F. MENDELSOHN
Deputy Chief, Fraud Section

By: *(signature)*
Kathleen M Hamann
Trial Attorney, Fraud Section

William Jacobson
Assistant Chief, Fraud Section

Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20530
(202) 305-7413